In Re Torregrosa, Querellado.

Solicitud presentada por el Attorney General sobre separación del querellado del ejercicio de la abogacía y del notariado.

No. 9.—Resuelto en julio 23, 1917.

Abogados — Separación del Ejercicio de la Abogacía — Notarios Públicos — Testamento Falso.—Un abogado que usando de las facultades que le confiere su título para ejercer la notaría, consigna que un hombre otorgó ante él su última voluntad, cuando es lo cierto que aquel hombre se encontraba moribundo y no pudo expresar ni expresó cuál era esa voluntad, no debe continuar siendo abogado.

Evidencia — Presunción. — Toda evidencia voluntariamente suprimida por una parte, debe presumirse que de haberse producido resultaría adversa para dicha parte.

Los hechos están expresados en la opinión.

Abogados del querellante: *Sres. Salvador Mestre, fiscal del Supremo, y José E. Figueras, fiscal del Distrito.*

Abogados del querellado: *Sres. Luis Llorens Torres* y *Nemesio R. Canales.*

El Juez Asociado Sr. del Toro, emitió la opinión del tribunal.

El presente es un caso de *disbarment.* Se imputó al abogado Angel N. Torregrosa el hecho de haber autorizado el 9 de marzo de 1915, en Aguadilla, como notario público,—cargo que ejercía de acuerdo con la ley por virtud de su título de abogado,—el testamento falso de Artemio Vergne Muñoz.

Presentada la querella, se suscitaron varias cuestiones de derecho que fueron resueltas por la corte y se señaló día para la práctica de las pruebas. Estas consistieron en documentos y declaraciones de testigos.

El testamento de que se trata, copiado a la letra, dice así:

"Número trece. Testamento abierto. En la ciudad de Aguadilla a las tres de la tarde del día nueve de marzo de mil novecientos quince. Ante mí, Licenciado Angel M. Torregrosa, abogado y notario de Puerto Rico, con residencia, vecindad y estudio en Aguadilla. Comparece. En esta su casa habitación, donde me constituí previo requerimiento, Don Artemio Vergne Muñoz, de cincuenta años de edad, soltero, comerciante, de esta vecindad e hijo legítimo de Don Guillermo y de Doña Soledad. Y hallándose en el pleno goce de sus facultades mentales habla expedita y capacidad legal necesaria para poder testar a juicio de los testigos y de mí el notario y además de su médico de cabecera el Doctor Don Simón Moret Muñoz, el que le asiste y me asegura también que está el dicho Señor Vergne en el pleno uso de sus sentidos a pesar de la dolencia que le tiene en cama, ordena su testamento como sigue: El funeral o entierro lo deja a disposición de su albacea para cuyo cargo nombra a Don Agustín Guevara y Santini. Declara que no tiene ascendientes ni descendientes legítimos ni naturales. Ordena que la declaración de sus bienes la haga su albacea de acuerdo con los inventarios, libros o papeles que se hallaren a su fallecimiento. Declara que tiene interés en la casa que gira en esta ciudad bajo la razón de 'López y Vergne' de la que es socio, que tiene algunas deudas en contra y otros a favor, las cuales quiere sean pagadas o cobradas religiosamente no pudiendo por momento determinar el montante de unas y otras. En el remanente de sus bienes, después de satisfechos los gastos de su enfermedad y muerte y de satisfechas sus deudas y en atención de los buenos procederes que para con él ha tenido su parienta Doña Josefa Muñoz Rivera de Guevara de esta vecindad, elige y nombra a ésta por única y universal heredera. Revoca y anula toda otra disposición anterior que de palabra o por escrito haya hecho con arreglo a sus bienes. Así lo otorga y no firma por impedírselo la debilidad de su pulso, pero autoriza al primero de los testigos para que lo haga a su nombre. Son testigos que conozco presentes, vecinos, mayores de edad, Don Enrique Falcón, Don Rosendo Pérez y Don José V. Cintrón. Y yo, el notario, del conocimiento del otorgante y testigos, de cuanto aquí se refiere y de ha-

:berse: cumplido las·:disposiciones ·del: Código ' Civil, ¯yo el :notario doy fe dándola también de aprobar el testador y testigos. el enmendado. 'V.' que ·vale. Por imposibilidad física del testador. Don Artemio. Vergne Muñoz y como testigo Enrique O. Falcón. ˙ Rosendo Pérez. José V. Cintrón. Dr. Moret˙ Muñoz. Firmado˙ y signado. ˙Angel M. Torregrosa.''

. : La prueba de cargo tendió a demostrar que Artemio .Vergne Muñoz. venía padeciendo de una larga enfermedad; que. sufrió dos operaciones, y que desde unos días antes de morir se encontraba en tal estado de postración que no podía. físicamente ejecutar acto alguno que dependiera de su voluntad, hallándose el día antes. de su muerte en el período agónico, .sin que se diera cuenta de nada. Siendo esto así, es claro que Vergne no pudo otorgar el testamento. La prueba de descargo tendió a demostrar que si bien Vergne se hallaba .gravemente enfermo conservó siempre el dominio de sus facultades y el día antes de morir, a su propio ruego, su médico llamó al notario Torregrosa y ante él Vergne otorgó su testamento con todas las formalidades de la ley.

El conflicto es evidente y toca a este tribunal estudiarlo y resolverlo. El hecho es grave. Un abogado que usando de las facultades que le confiere su título para ejercer la notaría consigna que un hombre otorgó ante él su última voluntad, cuando es lo cierto que aquel hombre se encontraba moribundo y no pudo expresar ni expresó cuál era esa voluntad, no debe continuar siendo abogado. La misma gravedad del hecho y la circunstancia de que de ser falso el testamento las personas que se hallaban presentes cuando se otorgó tomaron parte más o menos directamente en el acto delictivo, dificulta la · averiguación de la verdad.

Que Vergne se encontraba el día 9 de marzo de 1915 a las puertas de la muerte, está admitido por ambas partes. También lo está que a su casa ·concurrieron el Abogado-Notario Torregrosa, el Doctor Moret y las otras personas que intervinieron en el testamento, y que allí, el dicho día 9 de marzo de 1915, se hizo el documento. ¿Contiene éste la última vo-

luntad de Vergne? ¿Se encontraba Vergne en condiciones de expresarla?

Vergne era un comerciante establecido en Aguadilla, soltero, al parecer sin familia. Vivía solo. Antes había tenido relaciones ilícitas con una mujer que murió. Un muchacho hermano de ella, Diego González, siguió en la casa de Vergne a su servicio. Al tiempo de morir, Vergne llevaba relaciones amorosas lícitas con una joven de Mayagüez. Durante su enfermedad, sostenía correspondencia con ella escribiéndole sus cartas la *nurse* que lo asistía, Francisca Ramos, porque él estaba imposibilitado de hacerlo por sí mismo. Su intención al operarse había sido la de recobrar su salud para contraer matrimonio con su novia.

La enfermedad de Vergne fué larga y penosa. Lo operó dos veces y siguió asistiéndolo hasta que murió el Doctor Moret. Además de la *nurse,* estaba encargado de asistirlo de modo permanente Temístocles Vázquez. El muchacho Diego González tuvo un disgusto por haber faltado un dinero, pero volvió a la casa y en ella permaneció durante los últimos días de la vida de su dueño.

Temístocles Vázquez dijo que había hablado con Vergne como hasta nueve o diez días antes de su muerte, que después de esa fecha, le hablaba pero él no le contestaba, que Vergne estaba "casi moribundo" que "no se movía casi." Francisco López, socio de Vergne, fué a verlo el día en que aparece otorgado el testamento, y al acercarse a la puerta de la habitación se echó para atrás porque lo encontró para él tan grave, que estaba casi moribundo. El mismo día este testigo recibió encargo de la *nurse* de mandarle unas tazas y dinero para el velorio. Según Diego González, desde tres días antes de morir, Vergne "estaba con la vista tirada para atrás, y no decía nada." El testigo le habló y no le contestaba. Daniel Quintana estuvo a ver a Vergne horas antes del otorgamiento del testamento y la *nurse* lo llevó hasta su cama, "levantó (la *nurse*) un paño que tenía en la cara, lo ví y creí que estaba muerto, pero me fijé aquí (señalando la garganta) y ví

que había vida." Leopoldo Vázquez, que fué a la casa de Vergne comisionado por el socio de éste precisamente con objeto de explorar sus deseos acerca de si quería o nó testar, manifestó: "Entré a su cuarto y llamé a Don Artemio. Le dije: Don Artemio, dice su socio que si quiere hacer testamento. El me miró y no me dijo nada."

Leyendo las declaraciones completas de estos testigos, sus contestaciones a las preguntas y a las repreguntas, pueden encontrarse en ellas datos que levantan la duda de si Vergne se encontraba en realidad de verdad en un estado de postración tal que le era absolutamente imposible otorgar el testamento. Sin embargo, para el que conoce algo el corazón humano; para el que se fijó en la actitud de los testigos al declarar; para el que ha meditado en el plan de defensa del querellado, y en el largo tiempo transcurrido, la figura de Vergne, postrado, moribundo, sin el dominio de sus facultades, surge clara del dicho de esos testigos que son los que en ese extremo han merecido crédito a la corte. Además, las otras circunstancias que analizaremos en seguida nos llevan a inclinar la balanza de nuestro juicio del lado de la verdad de los cargos formulados contra el querellado.

Según el testigo Francisco López, el Doctor Moret lo citó para una conferencia en su oficina y en ella "me dijo que iba a cobrar por sus honorarios $3,000, que si quería hacer el negocio de darle $1,000 y entonces él me daría un recibo por los $3,000." López se negó a aquel engaño. Pues bien, ese Doctor Moret, pariente de la persona a cuyo favor testó Vergne, fué el que mandó a buscar al querellado, que para aquel entonces llevaba relaciones amorosas con una hija de la dicha persona a cuyo favor testó Vergne, para que autorizara el testamento; el que envió a su oficina cuando se iba a otorgar el documento a Temístocles Vázquez para que le dijera a una señora, que nunca llegó, que lo aguardara, y volvió a recomendarle al salir que le picara una mesa que estaba medio sucia; el que aseguró que el testador estaba en el pleno uso de sus facultades, y el que pidió por telégrafo

y por teléfono a Caguas con marcada insistencia los nombres de los padres de Vergne que aparecen consignados en el testamento. Quiso explicar el doctor su petición a Caguas del modo que sigue: que se encontraba en casa de la heredera y llegó el querellado y leyó el testamento y la heredera manifestó que el consignado no era el nombre del padre de Vergne; que si esto era así Vergne no hubiera tenido su inteligencia clara como él había afirmado, pues ninguna persona de clara inteligencia se equivoca al nombrar a sus padres, y entonces quiso averiguar la verdad llevado de su exceso de honradez profesional, pero esa excesiva honradez profesional no se armoniza con la actitud del doctor en la conferencia que tuvo con Francisco López, cuyo testimonio nos merece crédito.

Existe además la circunstancia de que no se explica el por qué de la elección de heredero. El parentesco es dudoso de que existiera. Las relaciones de amistad entre la heredera y el testador no eran ni siquiera conocidas por el socio del testador. Por el contrario parece inexplicable que Vergne olvidara por completo a su novia. Y son otros indicios el que se dejara de llamar al socio que estaba allí al lado, en la misma población, para que sirviera de testigo o presenciara el acto, y que, lo mismo que a Temístocles Vázquez, se enviara fuera de la casa al muchacho Diego González. Cuando éste regresaba de cumplir la comisión que se le había encomendado, encontró la casa cerrada, no pudo entrar. ¿A qué esa precaución?

Por último, existe una circunstancia que no puede dejar de pesar en nuestro juicio, a saber: la actitud de la defensa en relación con el testigo presentado por el Fiscal, Enrique O. Falcón. De todo lo ocurrido resalta el hecho de que ese testigo del Fiscal estaba controlado por la defensa y que por indicaciones de la defensa y usando un papel escrito por ella invocó su privilegio de no declarar porque su testimonio podía incriminarlo. Debe advertirse que dicho testigo, que es el que aparece firmando el testamento a ruego del testador, había declarado antes ante el Fiscal sin invocar tal privilegio.

Se ha querido explicar que la recomendación de la defensa se debió a que siendo muy nervioso el testigo, permitir que declarara era exponerlo a contradicciones.  A juzgar por su presencia, no parecía tan nervioso el testigo.  Además, si él realmente había intervenido y había firmado a ruego del testador, ¡era tan sencillo que así lo declarára!  Bajo todas las circunstancias que concurren, no podemos menos que aplicar la regla que dice que toda evidencia voluntariamente suprimida por una parte debe presumirse que de haberse producido resultaría adversa para dicha parte.  Y no se diga que al terminar la prueba, tratando de explicar el incidente, la defensa manifestara: ''Si la corte lo desea se puede traer al Sr. Falcón a declarar.  El motivo porque ha invocado el privilegio personal para no declarar es que es muy tímido, tiene un *tic* aquí en la cara, un movimiento nervioso, que le impide hablar delante de nadie.''  No era la corte la que tenía que expresar su deseo.  Era la defensa la que debía resolver por sí misma, y su última manifestación, si algo demostró, fué aclarar aun más el hecho de que el testigo Falcón estaba enteramente controlado por ella.

Por virtud de todo lo expuesto, opinamos que debe declararse probado el cargo imputado al querellado y separársele del ejercicio de su profesión de abogado-notario, con los demás pronunciamientos de ley.

> *Separado el querellado del ejercicio de su profesión de abogado, así como del ejercicio del notariado.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados Wolf, Aldrey y Hutchison.